## Rutter's Estate.

*Charities—Agreement by inmate to assign property to home—Breach— Damages.*

When an inmate of a home for the indigent executes an agreement by which she undertakes to assign to the home all the property which she may have or of which she may become possessed, the claim of the home against her estate for failure to make the assignment is a claim for damages for breach of contract; and where the agreement further provides that, in case of a breach of contract, the inmate shall pay for board and lodging at a specified rate per week, the damages are thereby liquidated and the home cannot recover any greater sum. Such an agreement will not sustain a claim by the home to the inmate's residuary estate in the nature of a bill for specific performance.

Exceptions to adjudication. O. C. Phila. Co., Jan. T., 1922, No. 206.

C. B. D. *Richardson*, for exceptant; *Edward Hopkinson, Jr.*, contra.

THOMPSON, J., March 31, 1922.—Margaret J. Rutter, a widow, eighty-three years old, made written application for admission to The Rebekah Home under date of Aug. 30, 1920. In her application she said that all the property she had left was a $100 Liberty Bond. The application concluded with: "I also agree that I will, previous to my admission to said Home, assign, transfer or

1 D. & C.

### Rutter's Estate.

set over in writing to said Home any money or property of any kind of which I may now have or may become possessed. I further agree and promise to obey all rules of said Home . . . ; and, further, that any untrue or fraudulent statement or any concealment of fact made by me in this, my application, will forfeit my right to become or remain a resident of the said Home."

On the same date, Aug. 30, 1920, she signed a paper marked "Agreement," which contained the following:

"Second. That I will, in consideration of my admission to said Home, and prior thereto, agree to assign, transfer and deliver all my property of every character and description, which I now have or may hereafter receive or acquire, to said Home, absolutely, the Board of Directors of said Home to provide therefrom for my personal uses as the said Board of Directors may deem proper, and to pay for my funeral expenses in accordance with the usual regulations of said Board of Directors.

"Third. Any disposition of my real and personal estate, or any part thereof, in a manner unfair and unjust to said Home, or in violation of any part of this Agreement, or should I neglect or refuse to obey all the rules and regulations prescribed for the government of the residents of said Home, or any lawful command of the authorities in charge thereof, then, and in such case, such conduct on my part will be sufficient cause for my dismissal from said Home, and upon my dismissal, I do hereby waive all claim or right against said Home for my support and maintenance, or any other right, claim or demand under this Agreement.

"Fourth. In the event of my dismissal or my voluntary withdrawal from said Home, all moneys remaining, except sick benefits paid under Section 1 of this Agreement, after deducting (1) all such personal expenses as may have been paid for, or to me; and (2) a sum not exceeding $5.00 per week for each and every week I have been a resident of said Home, shall be returned to me upon giving a full and absolute release and acquittance and discharge from all liability to said Home.

"Fifth. Should it be discovered while I am a resident of said Home, or after I should voluntarily withdraw or leave the said Home, that I had personal or real property which I failed to transfer, assign or deliver to said Home, then said Home shall have the right and privilege of charging against me and recovering the same by due process of law the sum of $5.00 per week for each and every week while I am a resident thereof."

The application was forthwith acted upon by the Home Committee on Oct. 13, 1920, and decedent was admitted to the Home on Nov. 10, 1920, and died in said Home Dec. 20, 1920, leaving a will dated May 28, 1920, whereby she gave her entire estate to her son, John M. Rutter. A granddaughter of the decedent, on Dec. 28, 1920, sent to the Home the two Liberty Bonds of $50 each.

At the time of testatrix's death, she had a certificate of deposit of the Manayunk Trust Company, dated on or prior to April 4, 1919, in the sum of $2200, which, with the accrued interest thereon, has been collected by her executor and is now accounted for, and which (after an allowance to the Home of $77.55, being the amount due said Home for six weeks' board and funeral expenses paid by them, less the proceeds of the two Liberty Bonds) was awarded to the legatee named in the will of decedent, to which exceptions have been filed by the Home.

As was very properly said by the auditing judge: "It is, of course, obvious that the decedent misrepresented to the Home the amount of her property, and the Home might have declared her rights forfeited under the Agreement and

Rutter's Estate.

expelled her therefrom. It was also obvious that she did not perform her agreement to assign her property to the Home, but it seems equally obvious that the right to specific performance of the contract was negatived by the terms of the agreement, which expressly provide for the consequences of a breach. The Rebekah Home is entitled to recover damages simply for the breach of contract."

The failure of the Home to take an absolute present assignment of whatever property was owned by the decedent at the time of her entry into the Home, and their failure even to demand immediate delivery of the two Liberty Bonds which they knew she possessed, coupled with the provision as set forth in paragraph fifth above referred to, shows that the Home contemplated that the decedent might have made false statements in respect to her property, and in that event they provided for charging decedent board at the rate of $5 per week during the time she was a resident in said Home. In none of the papers signed by the decedent is it stipulated or even contemplated that the Home was to become the owner of any property of the decedent not disclosed in her application and agreement. We, therefore, have a case where the decedent agreed with the Home to do a thing which she did not do, and the question arises as to what is the measure of damages for said failure so to do. We think the measure of damages is as set forth in paragraph fifth above quoted, and as the claimant has received board at the stipulated rate of $5 per week during such period as decedent was in the Home, together with her funeral expenses paid by the Home, less the value of the Liberty Bonds turned over to the claimant after decedent's death, we are of opinion that the Home has received all it is legally entitled to. See Graham v. Graham's Executors, 34 Pa. 475, affirmed in Carroll's Estate, 219 Pa. 440; Maull's Estate, 186 Pa. 477.

All the exceptions to the action of the auditing judge are, therefore, dismissed, and the adjudication is confirmed absolutely.